UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SOUTHEASTRANS, INC.                     CASE NO.  20-CV-00086

VERSUS                                   JUDGE ROBERT R. SUMMERHAYS

MORGAN LANDRY, ET AL.                    MAGISTRATE JUDGE WHITEHURST


MEMORANDUM RULING

Pending before the court is a Motion for Partial Summary Judgment [ECF No. 24] filed by Medi Trans, LLC ("Medi Trans"). Medi Trans seeks dismissal of Southeastrans, Inc.'s ("Southeastrans") claim that Medi Trans violated a non-competition provision in the Non-Emergency Medical Transportation Provider Agreement (the "Provider Agreement") executed by the parties. Southeastrans has filed an opposition [ECF No. 28], to which Medi Trans has filed a reply. [ECF No. 30] For the following reasons, the motion is GRANTED.

I.
BACKGROUND

Southeastrans is a Georgia corporation that provides non-emergency medical transportation ("NEMT") brokerage services throughout the United States. [ECF No. 1 at 1] Defendants Landry and Lester were employed by Southeastrans in Louisiana until late 2019. [ECF No. 1 at 2] Southeastrans alleges that, in addition to general policies related to the use of proprietary and confidential information, Landry's employment agreement included non-competition provisions prohibiting him from competing with Southeastrans and soliciting Southeastrans' customers; the agreement also requires the return of all of Southeastrans' confidential information upon termination of his employment. [ECF No. 1 at 3-4] Southeastrans asserts that under the Provider Agreement, Medi Trans agreed to provide transportation services,

1

agreed not to compete with Southeastrans in the NEMT market, and agreed not to solicit Southeastrans' employees for up to one year after their employment terminated. [ECF No. 1 at 6-7] Medi Trans' non-competition agreement is contained in section III(A)(8) of the Provider Agreement ("Section III(A)(8)"). Southeastrans alleges Landry and Lester negotiated with Medi Trans to develop a competing NEMT brokerage business for it while they were still employed by Southeastrans. It also alleges that they either copied or failed to return Southeastrans' proprietary and confidential information and are using this confidential and proprietary information to compete with it. [ECF No. 1 at 4-7]

Southeastrans filed a Complaint alleging that the defendants violated their non-competition and non-solicitation agreements with Southeastrans, and that they used Southeastrans' proprietary or confidential information to compete against it. [ECF No. 1] Southeastrans further asserts claims for trade secret misappropriation in violation of 28 U.S.C. § 1831, *et seq.,* violation of the Louisiana Uniform Trade Secrets Act, La. R.S. 51:1431, *et seq.*, and deceptive practices in violation of the Louisiana Unfair Trade Practices Act. Southeastrans further asserts that Landry and Lester violated their fiduciary duties to Southeastrans. Southeastrans requests damages and injunctive relief. [*Id.*]

The Court previously entered a temporary restraining order enjoining all defendants from using, sharing, altering, or destroying any confidential or proprietary information belonging to Southeastrans and from soliciting Southeastrans employees, among other orders. [ECF No. 8] Defendants then filed a Counterclaim asserting that Southeastrans has violated the Louisiana Unfair Trade Practices Act and committed tortious interference with their business relations, seeking damages and injunctive relief. [ECF No. 11] This Court previously dismissed those counterclaims. [ECF No. 46] Medi Trans now seeks dismissal of Southeastrans' claim that Medi

Trans violated its contractual agreement not to compete with Southeastrans as an NEMT broker. The Motion for Partial Summary Judgment does not address claims based on the solicitation of employees or any other claims asserted against Medi Trans.[1]

## II.
### SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, discovery products on file, and affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The purpose of summary judgment is to pierce the pleadings, to assess the proof, and to determine whether there is a genuine need for trial. *See Matsushita Electric Industries v. Zenith Radio Corp.* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment procedure is designed to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant bears the burden of persuasion at trial on a claim or defense addressed in the motion for summary judgment, the movant must establish that there is no genuine dispute of material fact as to those claims or defenses. To satisfy this burden, the movant must come forward with competent summary judgment evidence conclusively establishing that no reasonable trier of fact could find other than for the moving party. *See Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986). To avoid summary judgment, the non-movant must then come forward with evidence showing that there is a genuine dispute of material fact.

If the non-moving party has the burden of persuasion at trial with respect to an issue addressed in the motion for summary judgment, the moving party may satisfy its initial burden by

---

[1] Medi Trans' motion is styled as a Motion for Summary Judgment. However, the motion primarily addresses Southeastrans' claim arising out of the non-competition agreement. In its reply, Medi Trans clarifies that it seeks "partial summary judgment dismissing all claims asserted by Southeastrans that are in any way based on the clause [Southeastrans] claims prohibits competition." [ECF No. 30 at 2-3]

either (1) demonstrating affirmatively that there is no triable issue of fact as to each element of the non-moving party's affirmative defenses or claims, or (2) "showing" that the non-moving party cannot present evidence sufficient to satisfy the essential elements of its defenses or claims and thus cannot meet its burden of persuasion at trial. *Celotex Corp.*, 477 U.S. at 324–326, 106 S. Ct. 2548. If the moving party makes a showing that there is "no evidence" to support the non-moving party's claims or defenses, the non-moving party must come forward with "substantial" evidence showing a genuine dispute of material fact with respect to each essential element of its affirmative defenses or claims. *Id.* Substantial evidence for purposes of defeating summary judgment is evidence sufficient to support a jury verdict in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–252, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). Under this standard, the non-movant cannot rely on unsupported assertions or arguments but must submit sufficiently probative evidence supporting its claims or defenses. Even if the burden shifts to the non-moving party, the movant still retains the ultimate burden of persuasion on the motion for summary judgment. *Celotex Corp.*, 477 U.S. at 330–331, 106 S. Ct. 2548.

In considering a summary judgment motion, "the court must disregard all evidence favorable to the moving party that the jury is not required to believe and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001); *see also Feist v. Louisiana, Dept. of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)(court must view all facts and evidence in the light most favorable to the non-moving party). "Credibility determinations are not part of the summary judgment analysis." *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 458 (5th Cir. 2002). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (alterations in original) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)).

## III.
### ANALYSIS

### A.  Does La. R.S. 23:921 Bar a Non-Competition Provision Between the Parties?

Medi Trans first moves for summary judgment on the grounds that the non-competition provision in Section III(A)(8) of the Provider Agreement is unenforceable under Louisiana Revised Statute 23:921. Medi Trans argues that La. R.S. 23:921 bars agreements that impose restrictions on competition unless they meet certain narrow exceptions, none of which apply here. [ECF No. 24-2 at 3] Even if one of the exceptions applies, according to Medi Trans, the non-competition provision in the Provider Agreement is unenforceable because it violates La. R.S. 23:921 by failing to limit the restriction to a specific geographic area. [ECF No. 24-2 at 4-5] Citing *Louisiana Smoked Prod. v. Savio's Sausage & Food Prod.*, 696 So.2d 1373 (La. 1997), Southeastrans argues that La. R.S. 23:921 does not apply to non-competition agreements between business entities that are on "equal footing." [ECF No. 28 at 3]

Louisiana Revised Statute 23:921 states that any agreement "by which anyone is restrained from exercising a lawful profession, trade or business" is null and void unless it falls within certain enumerated exceptions. La. Stat. Ann. § 23:921(A). Subsections (C)-(L) of section 23:921 enumerate the types of non-competition agreements that are permissible as well as time, geographic, and other restrictions on permissible non-competition agreements. In *Louisiana Smoked Products*, however, the Louisiana Supreme Court limited the application of 23:921(A) with respect to non-competition agreements between businesses. 696 So. 2d at 1375. That case involved a contract between two companies involving the manufacture and distribution of Cajun

food products. This contract included a non-competition provision that prohibited both parties from directly competing with the other party's business activities for a three-year period following termination of the contract. When the business relationship soured, one party sued, claiming that the other party violated this non-competition provision. The Louisiana Supreme Court reviewed the history of section 23:921 and noted that the original purpose of the statute was to enact Louisiana's deeply rooted public policy against employment contracts that restrict employees from competing with a former employer. *Id*. at 1379. This public policy is grounded on the often-unequal bargaining power between employees and employers and the concern that these restrictions on competition exclude "individuals from the fields of work for which they were perhaps best suited." *Id.* The court concluded that these policy concerns are absent when corporations "on equal footing" agree to non-competition restrictions. *Id*. at 1378-80. The court concluded that the parties in *Louisiana Smoked Products* were on equal footing because there was no disparity in bargaining power between them; the parties were equally bound to the clause; neither party had control over the other; there was no employer-employee relationship; and the prohibition on competition was reasonably limited in duration. *Id*. at 1380. Furthermore, according to the court, both parties benefitted from the contract, and the contract was prepared, reviewed, and approved by an attorney for the party who was challenging the non-competition provision. *Id*.

In *Security Alarm Fin. Enters. v. Green*, No. 06-30332, 2007 U.S. App. LEXIS 4836 (5th Cir. March 2, 2007), the Fifth Circuit held that *Louisiana Smoked Products* is the proper standard to apply to non-competition agreements between business entities that are on an equal footing. There, the district court originally granted summary judgment on the grounds that a non-competition agreement between two business entities did not comply with the requirements of section 23:921. The circuit court reversed, holding that the district court should have applied

*Louisiana Smoked Products*, and that section 23:921 was inapplicable if the parties were on equal footing. On remand, the district court denied summary judgment, concluding that there were genuine questions of material fact as to whether the parties were on "equal footing."

Here, to prevail on summary judgment, Medi Trans must establish that the non-competition provisions in the Provider Agreement violate section 23:921 as a matter of law. Medi Trans must, however, first establish that section 23:921 applies to the parties' relationship. The Court concludes that Medi Trans has not met its summary judgment burden. Both parties are business entities and there is no evidence of an employee-employer relationship. As in *Louisiana Smoked Products*, both parties appeared to have received benefits under their business arrangement. Also, there is no evidence in the summary judgment record that either party had superior bargaining power when they entered into the Provider Agreement. As far as control, Medi Trans argues that "Southeastrans had superior if not exclusive control in all respects." [ECF No. 30 at 2] But Medi Trans points to no specific provision of the Provider Agreement nor any evidence in the summary judgment record to support this argument. The duration of the non-competition provision also appears to be limited to the duration of the Provider Agreement. Section III(A)(8) of the agreement does not state the duration of the non-competition restriction. This suggests that it does not survive termination of the Provider Agreement. *See Int'l Ass'n of Machinists & Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp.*, 122 F.3d 228, 232 (5th Cir. 1997)("[C]ontractual obligations will cease, in the ordinary course, upon termination of the [contract]")(citing *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, 501 U.S. 190, 207, 111 S. Ct. 2215, 2226, 115 L. Ed. 2d 177 (1991)). Nor does the Provider Agreement appear to provide that the non-competition provision survives the expiration or termination of the Provider Agreement. Finally, unlike *Louisiana Smoked Products*, the non-competition provision in this case only applies to Medi Trans.

In other words, the restriction is not mutual. However, considering the summary judgment record as a whole, the Court cannot conclude, as a matter of law, that the parties are not on an equal footing based on the lone fact that the restriction is not mutual.

In sum, Medi Trans has not established, as a matter of law, that section 23:921 applies to Section III(A)(8) of the Provider Agreement. Accordingly, Medi Trans cannot rely on section 23:921 to invalidate the non-competition provision in Section III(A)(8).[2]

**B.  Does the Provider Agreement's Plain Meaning Prohibit Medi Trans from Providing NEMT Broker Services?**

The Court now turns to Medi Trans' argument that, even if the non-competition provision in the Provider Agreement is valid under La. R.S. 23:921, the plain language of the Provider Agreement only restricts Medi Trans from providing *transportation* services, not *brokerage* services. [ECF No. 24-2 at 4] Southeastrans contends that the Provider Agreement prohibits Medi Trans from entering into any agreement that involves transportation *or* brokerage services. [ECF No. 28 at 5-6][3]

Whether a contract is ambiguous is a question of law. *Sims v. Mulhearn Funeral Home, Inc.*, 956 So.2d 583, 590 (La. 2007). "Under Louisiana law, the interpretation of an unambiguous contract is a question of law that can be decided on a motion for summary judgment." *IFG Port Holdings, LLC. v. Lake Charles Harbor & Terminal Dist.*, No. 16-CV-00146, 2019 WL 1064264, at *7 (W.D. La. Mar. 6, 2019)(citing *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 668 (5th Cir. 2012). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code

---

[2] Given that Medi Trans has not established that section 23:921 applies to the Provider Agreement, the Court need not address Medi Trans' argument that the Provider Agreement does not include a permissible geographic restriction under section 23:921.

[3] The parties do not dispute that the Provider Agreement is no longer in effect between them. [ECF Nos. 28 at 5-6; 30 at 2]

Ann. art. 2046. Common intent is determined, therefore, in accordance with the general, ordinary, plain, and popular meaning of the words used in the contract. *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 2012-2055 (La. 3/19/13), 112 So. 3d 187, 192 (citing *Prejean v. Guillory*, 10–0740 (La.7/2/10), 38 So.3d 274, 279). The text of a contract that is clear and unambiguous "should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties." *Id.*

Southeastrans asserts that Medi Trans is barred from competing as a broker by Section III(A)(8), which states that "Provider [Medi Trans] shall not, without prior approval from the BROKER [Southeastrans] and the Prime Contractor, enter into any subcontractor or other agreement for any services contemplated under this Contract." [ECF No. 28-2 at 4][4] Medi Trans argues that the only plausible reading of this provision is that it prohibits Medi Trans from entering a subcontractor agreement or other agreement for the services Medi Trans is obligated to perform under the Provider Agreement: on-street transportation services. [ECF No. 30 at 2] Medi Trans argues that Section III(A)(8) consequently does not prohibit Medi Trans from entering into separate agreements to provide NEMT broker services during the term of the Provider Agreement. In other words, broker services are not "services contemplated under" that agreement.

Southeastrans argues that the Provider Agreement describes the duties and obligations of *each party*, and therefore the phrase "any services contemplated under this Contract" includes the services to be performed by *Southeastrans*, i.e., NEMT broker services. [ECF No. 28 at 6] Medi

---

[4] Medi Trans initially asserted that the relevant non-competition covenant stated that "Provider shall not, without prior approval of the BROKER and ALGA, enter into any subcontract or other agreement for any work contemplated under this agreement." [ECF No. 24-2 at 4] Southeastrans argued that this language is from an outdated version of the Provider Agreement [ECF No. 28 at 6] and attached what it asserts is the most recent executed Provider Agreement. [ECF No. 28-2] Medi Trans agrees that the version attached by Southeastrans is the proper document for the Court to consider. [ECF No. 30 at 2]

Trans is prohibited, therefore, from acting as an NEMT broker during the existence of the Provider Agreement. Southeastrans further argues that restricting "any services under this Contract" to NEMT transportation services would render other provisions of the contract superfluous. [*Id.*] The only example Southeastrans provides to support this argument is Section IV(D) of the Provider Agreement, which allows Southeastrans to assign its rights and responsibilities under the agreement but bars Medi Trans from assigning its own rights and responsibilities without Southeastrans' written consent. [ECF No. 28-2 at 11] Southeastrans argues that if Section III(A)(8) only prohibits Medi Trans from entering a subcontract or other agreement regarding transportation services, then Section IV(D) has the same effect and is duplicative. [ECF No. 28 at 7-8] Southeastrans argues that this reading of the Provider Agreement violates the applicable canons of contract interpretation. [ECF No. 28 at 7-8]

The Court disagrees. The text of Section III(A)(8) is not ambiguous, and Southeastrans' expansive interpretation of the scope of the non-competition restriction in Section III(A)(8) is inconsistent with the text of that provision and the Provider Agreement as a whole. First, a natural reading of the phrase "subcontractor or other agreement" suggests that this language bars Medi Trans from entering into subcontractor agreements or agreements similar to subcontractor agreements;  the specific term "subcontractor" limits the scope of the more general term ("other agreements") that follows it. *Weisbart & Co. v. First Nat'l Bank of Dalhart, Tex.*, 568 F.2d 391, 395 n. 6 (5th Cir.1978) (the doctrine of *ejusdem generis* "counsels that general words following an enumeration of particular or specific items should be construed to fall into the same class as those items specifically named.") Contrary to Southeastrans' position that the clause "or other agreement" could refer to any type of agreement, the phrasing of the provision implies that "subcontractor" is the type of agreement that is restricted by Section III(A)(8), along with other

agreements of similar effect. This reading of the text is supported by the Recitals in the Provider Agreement that Southeastrans wishes to enter the agreement in order to secure "high-quality [NEMT] services." [ECF No. 28-2 at 3] Southeastrans would have less direct ability to ensure the quality of the transportation services if Medi Trans were allowed to subcontract those services to other entities. Reading the text together, therefore, Section III(A)(8) prohibits Medi Trans from entering into subcontracts or similar types of relationships and cannot be read to preclude Medi Trans for providing brokerage services.

Furthermore, Southeastrans' expansive reading of the non-competition clause is not "suggested by the contract as a whole." *Clovelly,* 112 So.3d at 192. Southeastrans argues that the phrase "any services contemplated under the Contract" implicates the *brokerage* services provided by Southeastrans, not just the *transportation* services to be provided by Medi Trans pursuant to the Provider Agreement. [ECF No. 28 at 6] However, Southeastrans does not provide broker services to Medi Trans under the Provider Agreement. As stated in the Recitals, Southeastrans provides brokerage services under separate contracts with the Louisiana Department of Health ("LDH") and/or Managed Care Organizations ("MCOs"). [ECF No. 28-2 at 3] In contrast, Southeastrans entered the Provider Agreement for the purpose of securing "the provision of high-quality on-street [NEMT] services." [*Id.*] Similarly, Medi Trans entered the Provider Agreement in order to provide those on-street NEMT services. [*Id.*] This leads to the conclusion that the clause "any services contemplated under the Contract" in Section III(A)(8) refers to the *transportation* services provided by Medi Trans under the Provider Agreement, not brokerage services provided by Southeastrans pursuant to other contracts.

The structure of the parties' obligations under the Provider Agreement supports this reading of the non-competition clause. As described by Southeastrans, its responsibilities involve

scheduling trips with Medi Trans according to information received from the Prime Contractors, ensuring that Medi Trans has qualified drivers and proper vehicles, and paying for the trips performed. [ECF No. 28 at 6] These responsibilities, however, are governed by independent contracts with the LDH and MCOs. The Provider Agreement makes clear in Section V(A)(1) that LDH and the MCOs have "no relationship to [Medi Trans] for any services that [Medi Trans] may provide for or on behalf of" individuals, i.e., transportation services. [ECF No. 28-2 at 11] The Provider Agreement, therefore, encompasses transportation services to individuals in exchange for payment by Southeastrans; not broker services provided by Southeastrans pursuant to other agreements.

An additional problem with Southeastrans' reading of Section III(A)(8) is that it has no limitation. One result of Southeastrans' reading of Section III(A)(8) is that Medi Trans would be prohibited from providing transportation services to any other entity, including any other broker. However, nothing in the Provider Agreement indicates that the parties intended to create such a restriction on Medi Trans' transportation services. In fact, Section V(A) of the Provider Agreement expressly provides that "[e]ach [party] is free to enter into agreements with other entities or persons to provide the same or similar services" as those contemplated in the Provider Agreement. [ECF No. 28-2 at 11][5] Southeastrans' reading of Section III(A)(8) as essentially creating an *exclusive* agreement to provide transportation services by Medi Trans to Southeastrans thus directly contradicts Section V(A) of the Provider Agreement.

---

[5] Additionally, Section II(A) states that Southeastrans is "under no obligation to provide [Medi Trans] with a specific number of transportation requests…." [ECF No. 28-2 at 3] Nor does the Provider Agreement appear elsewhere to guarantee that Southeastrans will pay any amount other than in exchange for providing transportation to individuals. Requiring Medi Trans to provide transport services to Southeastrans exclusively without ensuring that Medi Trans can remain solvent under the agreement would create a threat to the long-term sustainability of the arrangement, an arguably absurd conclusion. This further suggests that the exclusivity required by Southeastrans' proffered interpretation is not evidenced by the agreement as a whole, and therefore that that interpretation is incorrect.

Southeastrans' argument that Medi Trans' reading of Section III(A)(8) makes Section IV(D) of the Provider Agreement superfluous is also unpersuasive. Potentially ambiguous contractual provisions should be interpreted so as not to render other provisions meaningless or superfluous. *Texas E. Transmission Corp. v. Amerada Hess Corp*., 145 F.3d 737, 742 (5th Cir. 1998). Section III(A)(8) provides that Medi Trans must get approval from Southeastrans and the Prime Contractors before entering into any "subcontractor or other agreement" for any services contemplated by the Contract, which the Court reads as meaning any contract similar in effect to a subcontract. Section IV(D) provides that Medi Trans may not assign, transfer, delegate, consign, suborn, or convey to another person Medi Trans' rights and responsibilities under the Provider Agreement without the consent of Southeastrans. [ECF No. 28-2 at 11] The terms of these two provisions explicitly contemplate different actions: it is possible to enter a subcontract to provide or receive services without assigning one's rights under the primary contract, and it is possible to assign or convey one's rights under a contract without entering into a subcontract to provide or receive services. Subcontracting and assigning rights are separately prohibited by different provisions of the Provider Agreement. Restricting Section III(A)(8) to only prohibit subcontracting of transportation services – as Medi Trans argues – would not convert it into a restriction on the conveyance of rights. Consequently, the Court does not find that reading Section III(A)(8) in the way Medi Trans requests would render Section IV(D) superfluous.

In sum, the Court's role is not to alter the Provider Agreement but only to interpret it. *Clovelly Oil*, 112 So. 3d at 196 (citations omitted). Southeastrans' reading of Section III(A)(8) is inconsistent with the text of the non-competition provision and the Provider Agreement as a whole. The text of the Provider Agreement is unambiguous and can be construed as a matter of law. The Court concludes that Section III(A)(8) does not, as a matter of law, prohibit Medi Trans from

entering into an agreement to provide or receive NEMT brokerage services. Accordingly, Medi Trans' motion is GRANTED, and Southeastrans' claim that Medi Trans violated the non-competition provision in Section III(A)(8) of the Provider Agreement is DISMISSED.

## IV.
### CONCLUSION

For the foregoing reasons,

IT IS HEREBY ORDERED that Medi Trans' Motion for Partial Summary Judgment [ECF No. 24] is GRANTED. Southeastrans' claim that Medi Trans violated a contractual agreement not to compete in the area of NEMT brokerage services is DISMISSED.

THUS DONE in Chambers on this 12th day of March, 2021.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**